IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| ESTATE OF DAVID PAUL MCFARLIN, BY its Personal Representative, JAMIE LAASS; JAMIE LAASS, Individually; JAMIE LAASS, As Parent and Next Friend of S.L., <br><br>Plaintiffs, <br>vs. <br><br>LAKESIDE MARINA, INC., <br><br>Defendant. | No. C12-4055-MWB <br><br><br>**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

_____

**TABLE OF CONTENTS**

*I.    INTRODUCTION AND BACKGROUND...............................................2*
  *A.    Factual Background ...................................................................2*
  *B.    Procedural Background ............................................................8*

*II.   LEGAL ANALYSIS ........................................................................ 10*
  *A.    Summary Judgment Standards................................................ 10*
  *B.    Does Lakeside Have A Duty To Warn Boaters?........................... 12*

*III.  CONCLUSION.............................................................................. 17*

This case arises from a terrible boating tragedy. On May 31, 2010, plaintiff Jamie Laass was riding with her two children, ten-year old David Paul McFarlin and

S.L., in a boat operating on Storm Lake when the boat struck a submerged dredge pipe causing the boat's motor to flip up into the boat with the propeller still running. The motor, including the spinning prop, struck David, causing his death. The issue that confronts me here is whether the defendant marina, from which the boat was launched, owed a duty to warn plaintiffs about the dredging operations on Storm Lake.

## I.  INTRODUCTION AND BACKGROUND

### A.  *Factual Background*

I set out only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the defendants' motion for summary judgment and resistance to it. At least for the purposes of summary judgment, the facts recited here are undisputed. I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

Defendant Lakeside Marina, Inc. ("Lakeside") is a privately owned Iowa corporation doing business in Buena Vista County, Iowa. Jim Davis and his wife, Mary Jo Davis (collectively, "the Davises"), are Lakeside's owners and managers. The Davises do not own the premises on which Lakeside is located, but lease the property from the City of Lakeside, Iowa ("the City"). On March 5, 1998, the City and Lakeside entered into a lease agreement under which the City leased lakefront property to Lakeside for 25 years ("the Lease").

The Lease provides, in pertinent part, that:

> 3.  TENANT agrees that during the terms of this lease, that they will use and occupy the leased premises for lawful purposes, but primarily for the operation of a boat marina. TENANT is not restricted only to the operation of the demised premises as a boat marina, provided that the additional, lawful business purposes bear some logical and reasonable relationship to the recreational use of the lake.

2

> TENANT also covenants and agrees that boat marina services shall be available to the public a minimum from Memorial Day through Labor Day of each year.
>
> 4. TENANT covenants and agrees to maintain the demised premises in a reasonably clean and presentable condition, to pick up debris, and to maintain all buildings and other structures in a serviceable, safe and presentable condition.

The Lease at ¶¶ 3-4; Plaintiffs' App. at 66. The Lease further provides that:

> 9. TENANT will protect, indemnify and save harmless the landlord from and against any and all loss, costs, damage and expenses including attorney fees and expenses occasioned by or arising out of, any accident or other occurrence causing or inflicting injury and/or damage to any person or property, happening or done, in, upon or about the leased premises or due directly or indirectly to the tenancy, use or occupancy thereof or any part thereof by the TENANT or any person claiming to act under or at the direction of the TENANT.

The Lease at ¶ 9; Plaintiffs' App. at 67-68. The Lease also contains the following provision:

> 11. TENANT further covenants and agrees that it will, at its own expense, procure and maintain casualty and liability insurance in a responsible company or companies authorized to do business in the state of Iowa with coverages to include the docks and appurtenant structures ascending into or abutting Storm Lake (the lake not the city), in amounts not less than one million dollars ($1,000,000.00) for any one injured and one million dollars ($1,000,000.00) for any one accident (occurrence) and with limits not less than one hundred thousand dollars ($100,000.00) for property damage protecting the CITY against such claims, damages, costs and expenses on account of injury to any person or persons by reason of such casualty, accident or

3

>happening on or about the demised premises during the terms of this lease.

The Lease at ¶ 11; Plaintiffs' App. at 68. In addition, the Lease provides that:

> 15. TENANT agrees that the above described leased premises will not be used for any unlawful purpose and that the right of the public to enter said premises for any lawful purpose is expressly preserved.
>
> 16. TENANT agrees to maintain a boat marina on said premises which shall be available for the accommodation of the public and for the purpose of encouraging and facilitating recreational use of Storm Lake by citizens of Iowa for boating, fishing and related purposes.
>
> . . . .
>
> 19. TENANT is advised that all signs that it intends to use on the above described premises, must comply with the city ordinances of the city of Lakeside, Iowa.
>
> . . . .
>
> 23. The demised premises are being used by the TENANT for the principal purposes of providing boating and similar recreational services for the use and benefit of the citizens of Lakeside, Storm Lake, and the public at large.

The Lease at ¶¶ 15-16, 19, and 23; Plaintiffs' App. at 69-71.

Lakeside is located on property adjacent to the east side of Storm Lake. It provides the public free access to Storm Lake via a boat ramp on its premises. Lakeside also provides supplemental services to boaters, including: renting docking space; providing some engine repair; renting campsites; and selling gasoline, bait, fishing licenses, snacks, and beverages at its convenience store. Lakeside does not

4

charge a fee of any kind for use of the boat ramp on its premises. No one in plaintiffs' boating party was charged a fee for use of Lakeside's boat ramp.

On May 31, 2010, Harry Foote, David McFarlin, Jamie Laass, her two children, David Paul McFarlin and S.L., and two other children traveled to Storm Lake to go fishing from their boat. Foote had been boating on Storm Lake three or four times before May 2010. Foote was aware about the dredging operations taking place on the lake. Foote and the others in his party arrived at Lakeside at approximately 9:00 a.m. to 9:30 a.m. and launched their boat from the Lakeside boat ramp. While at Lakeside, Jamie Laass purchased a fishing license from Lakeside's convenience store, but no one in their boating party was charged any money for using Lakeside's boat ramp. After launching his boat, once out of the no wake zone, Foote began to accelerate and head west across the lake toward the dredging operations. As he approached the dredge, Foote became confused by the warning buoys and thought he was being directed to maneuver his boat between the main dredge and the auxiliary dredge, rather than being directed to avoid the area between the two dredges. Because of this confusion, Foote continued to drive his boat between the two dredges. As Foote drove closer to the pipe that connected the two dredges, he approached approximately six fishing boats, including Mr. and Mrs. Charles Greth's boat, who were fishing close to the pipe. The Greths began signaling Foote to slow his boat down by waiving their arms and making hand signals. These were signals they had learned, through boating experience, meant a boat should slow down. Foote did not see the Greths' signals and continued to proceed toward the pipe without slowing down. At this point, Foote's boat's motor assembly hit the dredge pipe, causing the outboard motor to flip up into the boat. David McFarlin was hit by the outboard motor's still rotating propellers, fatally injuring him. After the collision, Foote returned to the public boat ramp where emergency personnel were located. At the hospital, Foote told Sheriff Gary

5

Launderville that he had become confused by the placement of the buoys. Foote explained that, as a result of his confusion, he drove his boat between the dredges, rather than around them. Foote viewed his confusion as the cause of the accident. The area on Storm Lake where the accident occurred is not part of Lakeside's leasehold.

Since 2002, there have been ongoing dredging operations on Storm Lake. In 2002, the dredging operations were run by the State of Iowa. Since then, the dredging operations have been run by the Lake Improvement Commission ("LIC"). Patrick J. Kelly is the Public Works Director for the City of Storm Lake, Iowa. As Public Works Director, Kelly is "the direct supervisor of the dredging on Storm Lake and the City of Storm Lake employee responsible for structures maintained by the City of Storm Lake on and along the lake." Kelly Aff. at ¶ 1; Defendant's App. at 001. Kelly maintained this supervisory role even though LIC was running the dredging operation.

Over the years, Lakeside has received brochures from the City that provided warning information about the dredging operations at Storm Lake. Every year, Lakeside placed the brochures next to its convenience store cash register. Kelly has seen the brochures on Lakeside's convenience store counter. Lakeside's employees and managers answered questions from the public about the dredging operations by, *inter alia*, directing those individuals to the brochures provided by the City. Jamie Laass admits there is a "possibility" that the brochures were present in the Lakeside convenience store on the date of the accident and that she simply did not notice the brochures when she was in the convenience store to buy a fishing license.

From approximately 2003 through 2007, the State of Iowa had placed a portable sign at the Lakeside boat ramp warning boaters that dredging operations were taking place on the lake. At some point prior to 2008, the sign was removed because the

sign's post had rotted through and was no longer capable of supporting the sign.[1] Posting a new warning sign on the premises was feasible. Sometime in 2008 or 2009, Kelly and Jim Davis discussed placing a new warning sign at Lakeside to replace the one that had been removed. During this conversation, Kelly asked to erect a warning sign at the top of the boat ramp. Kelly did not explain why he though the best location for the warning sign was at the top of the boat ramp. Kelly did tell Davis that, at other locations along Storm Lake, the warning signs had been placed at the boat ramp. Davis told Kelly that he would not like the warning sign placed at the top of the boat ramp and suggested placing it by the road near Lakeside's entrance. Davis also suggested that the LIC could place a portable warning sign on the boat ramp, so that it could be moved and would not involve drilling holes in the concrete. Kelly decided not to put a warning sign by the road because he did not think it would be effective at that location. Kelly has no training or education in how people respond to signs and warnings. The day after the accident, personnel affiliated with LIC came to Lakeside and placed a portable warning sign near the boat ramp without ever consulting with Lakeside. Foote admits that his actions on the day of the accident would not have been any different if a warning sign, identical to the other warning signs around Storm Lake, had been placed at Lakeside on the day of the accident.[2]

---

[1] The record does not indicate who removed the original warning sign at Lakeside.
[2] The warning sign read:

### WARNING!
DREDGING WORK ONGOING

BEWARE OF EQUIPMENT, CABLE

AND PIPE, BOTH ABOVE AND

7

Lakeside's owners, managers, and employees had no control over or ownership interest in Storm Lake's open boating areas. On the day of the accident, Lakeside's owners, managers, and employees did not have any input or control over, or communications with, the individuals involved in the dredging operations taking place on Storm Lake. Lakeside's owners, managers, and employees did not have any control over, or involvement with, the dredging equipment, the dredging pipe, or the buoys near the dredging equipment. Lakeside's owners, managers, and employees did not have any input or control over the needs of the dredging operation. Neither of the Davises, nor any of Lakeside's employees has any specialized knowledge associated with running a dredging operation on a lake. Lakeside, its owners, managers, and employees are not agents or representatives of the LIC, the City, or any entity associated with the dredging operations that were occurring on Storm Lake at the time of the accident.

Kelly opined that it was the City/the LIC's responsibility to make the dredge operation safe for boaters. Kelly admits that he never consulted the Storm Lake City Attorney to attempt to determine what legal authority or responsibility he had to place a warning sign at Lakeside.

### B.    *Procedural Background*

On May 30, 2012, Laass filed her Complaint initiating this diversity lawsuit against Lakeside on behalf of David's estate, herself, and her surviving minor child,

---

BELOW WATER SURFACE, PLEASE

KEEP ALL WATER CRAFT AWAY

FROM WORK AREA!

Defendant's App. at 55.

S.L., to recover damages related to the boating accident that resulted in David's death.[3] Laass asserts a claim on behalf of David's estate for damages related to David's injury and death allegedly resulting from Lakeside's negligence. She also asserts claims on behalf of herself and her surviving minor child, S.L., for damages for emotional distress related to their presence as bystanders during the accident and for loss of consortium.

On July 10, 2013, Lakeside filed a motion for summary judgment contending that it owed no duty to warn boaters about the hazards of an ongoing dredging operation on Storm Lake. Alternatively, Lakeside argues that under the Iowa recreational use statute, Iowa Code § 461C.1 *et seq.*, it was immune from liability for its alleged negligence, and that plaintiffs cannot establish "willful or malicious" conduct on the part of Lakeside so as to fall within one of the statutory exceptions to the general rule of immunity. On August 12, 2013, plaintiffs resisted Lakeside's motion for summary judgment. Plaintiffs contend that Lakeside had a duty to warn them about the dredging operations on Storm Lake. Plaintiffs also argue that summary judgment is improper because the Iowa recreational use statute is inapplicable to Lakeside. Lakeside filed its reply on August 21, 2013.

---

[3] Plaintiffs previously brought a case in this court involving the same accident. In that lawsuit, however, plaintiffs named as defendants Foote; the manufacturer of the boat's motor, Brunswick Corporation, d/b/a Mercury Marine and Lund Boat Company; and the parties allegedly responsible for the dredge pipe and dredging operation on Storm Lake, the City of Storm Lake, Buena Vista County, the LIC, Randy Redig, Fussell Harrington, and David Botine. *See Estate of McFarlin ex rel. Laass v. City of Storm Lake,* 277 F.R.D. 384, 387 (N.D. Iowa 2011). The parties settled that case on June 12, 2012.

## II.     LEGAL ANALYSIS

### A.     *Summary Judgment Standards*

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a

11

> genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc).

Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006). Consequently, I turn to consider the parties' arguments for and against summary judgment.

### B. Does Lakeside Have A Duty To Warn Boaters?

In order to hold Lakeside liable on their negligence claim, plaintiffs must establish that Lakeside had a duty to warn them about the dredging operations on Storm Lake. *See Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 98 (Iowa 2012) ("[A]n actionable claim of negligence requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." (internal quotation marks and citations omitted)); *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (same). The central question Lakeside raises in its motion for summary judgment is whether it had a duty to warn Storm Lake boaters about the dangers of the dredging operation under Iowa law.[4] "The existence of a legal duty is a question of law for the court to decide." *McCormick v. Nikkel & Assocs.,*

---

[4] I need not make a determination as to a choice of laws in this case because the parties are in agreement that Iowa law is controlling on the issues raised by Lakeside's motion for summary judgment.

*Inc.,* 819 N.W.2d 368, 371 (Iowa 2012) (quoting *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 692–92 (2009)); *Estate of Pearson ex rel. Latta v. Interstate Power & Light Co.*, 700 N.W.2d 333, 341 (Iowa 2005). ("Whether a legal duty existed between the parties is a question of law."); *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999) (instructing that whether a legal duty "exists is a question of law.") (quoting *Leonard v. State*, 491 N.W.2d 508, 509 (Iowa 1992)); *Rieger v. Jacque*, 584 N.W.2d 247, 250 (Iowa 1998) (observing that whether the defendant owes a duty to the plaintiff arising "out of the parties' relationship is always a matter of law for the court.").

In *McCormick*, the Iowa Supreme Court offered the following instruction on how to determine whether one party owes a duty to another:

> An actionable negligence claim requires the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages. Whether a duty arises out of a given relationship is a matter of law for the court's determination.
>
> Historically, the duty determination focused on three factors: the relationship between the parties, the foreseeability of harm, and public policy. In *Thompson* we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent. But we did not erase the remaining law of duty; rather, we reaffirmed it. In short, a lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion.

*McCormick v. Nikkel & Assocs., Inc.,* 819 N.W.2d 368, 371 (Iowa 2012) (citing *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (internal citations and quotations omitted)). The court reiterated "that our previous law of duty was otherwise still alive and well." *McCormick,* 819 N.W.2d at 371.

13

My starting point is the "'common principle: *liability is premised upon control.*'" *McCormick,* 819 N.W.2d at 372 (quoting *Van Essen v. McCormick Enterprises Co.*, 599 N.W.2d 716, 720 n.3 (Iowa 1999) (quoting, in turn, *Allison ex rel Fox v. Page*, 545 N.W.2d 281, 283 (Iowa 1996) (internal quotation marks omitted)). A brief review of the decisions cited above illustrates this principle. In *McCormick,* the Iowa Supreme Court held that a subcontractor, who properly performed electrical work on a jobsite, then locked up the work and transferred control of the work site to the property owner, owed no duty of care to an employee of the owner injured when the owner failed to deenergize the work site. *McCormick,* 819 N.W.2d at 372. In *Van Essen*, the Iowa Supreme Court held a landlord that had installed a grain bin, but no longer controlled it, owed no duty to an employee of the lessee who was subsequently injured due to the allegedly hazardous condition of the bin. *Van Essen*, 599 N.W.2d at 720. In *Allison*, the Iowa Supreme Court had to determine whether a landlord was liable for injuries caused by a tenant's dog in the tenant's fenced-in yard when the landlord knew or had reason to know the dog was dangerous. *Allison,* 545 N.W.2d at 282. Significantly, the tenant acquired the dog after taking possession of the premises. *Id*. at 283. The court determined that, because the landlords did not have any right to control their tenant's dog, acquired after the tenant took possession, the landlords "owed no duty to third persons to protect them from the dog." *Id*. at 284.

Here, the uncontested facts are that Lakeside's lease with the City gave Lakeside a leasehold only in premises adjacent to the east side of Storm Lake and no interest or control whatsoever over the area of Storm Lake where the accident occurred. Additionally, Lakeside had no specific contact with the dredging operations being conducted on Storm Lake. As a result, Lakeside was not privy to the dredge operator's daily plans for and movement of the dredging operations. Lakeside also had no control or input into the dredging operator's actions to warn boaters about the dredging

14

operations. Plaintiffs direct me to no Iowa authority imposing a duty to warn under such circumstances. To the contrary, a number of courts in other jurisdictions have refused to impose a duty on landowners to warn of dangerous off-shore conditions. *Swann v. Olivier*, 22 Cal. App. 4th 1324, 28 Cal. Rptr. 2d 23 (1994), is illustrative of this line of authorities. In *Swann*, the plaintiff was injured in the surf while attending a beach party. He brought an action alleging that the beach's owner failed to warn him of riptides, submerged rocks, and other hazardous ocean conditions. *See id*. at 23-24. The California Court of Appeals explained that the decisive factor in the case was the "relatively straightforward" one of "where the injury took place and whether the defendants had any duty to warn of hazards in that area." *Id*. at 25. After observing the general rule under California law that a landowner "cannot be liable" for "injuries that occur on property outside one's ownership, possession or control," the court held that a beachfront landowner "has no duty to warn of dangers beyond his or her own property when the owner did not create those dangers."[5] *Id*. at 26. Because Iowa law

---

[5] Decisions from other courts are in accord with the *Swann* decision. *See Poleyeff v. Seville Beach Hotel Corp.,* 782 So. 2d 422, 424 (Fla. Dist. Ct. App. 2001) (holding that hotels and beach rental company had no "duty to warn, correct, or safeguard others from naturally occurring, even if hidden, dangers common to the waters in which they are found" because they did "not control the area or undertake a particular responsibility to do so.") (footnotes omitted); *Darby v. Compagnie Nat'l Air France*, 96 N.Y.2d 343, 753 N.E.2d 160, 163-64 (2001) (holding that hotel, which encouraged and facilitated use of beach by its guests but exercised no management, supervision, or oversight with respect to it, owed no duty to guests to warn of rip tides); *DeWick v. Village of Penn Yan*, 275 A.D.2d 1011, 713 N.Y.S.2d 592 (2000) (holding that proprietor of private beach owes no duty to warn of presence of sandbar and its natural transitory conditions); *Princess Hotels Int'l, Inc. v. Superior Court*, 33 Cal. App.4th 645, 39 Cal. Rptr. 2d 457 (1995) (owner of property adjacent to federally owned beach owes no duty to warn guest of ocean's dangers); *Sperka v. Little Sabine Bay, Inc.*, 642 So. 2d 654, 655–656 (Fla. Dist. Ct. App. 1994) (holding that an innkeeper owed no duty to warn its guest of a hidden sandbar in an adjacent public beach); *Adika v. Beekman Towers, Inc.*, 633 So. 2d 1170, 1171 (Fla. Dist. Ct. App. 1994) (holding that

15

has tied the question of duty to the issue of control, *see McCormick,* 819 N.W.2d at 372; *Van Essen*, 599 N.W.2d at 720; *Allison,* 545 N.W.2d at 284, I conclude that the *Swann* line of authority would be followed in Iowa.

In contrast, plaintiffs would, in effect, require lessees, like Lakeside, to oversee the entity performing the dredging operation. A duty of this kind would create the prospect of unlimited responsibility to warn of all manner of risks and hazards over which such a lessee has no control. It is this sort of liability which the Iowa Supreme Court rejected in *McCormick*, *Van Essen,* and *Allison*. Accordingly, I conclude that Lakeside had no common law duty to plaintiffs to warn them of the dredging operations on Storm Lake.

Even if no common law duty exists, plaintiffs argue that under Lakeside's lease with the City, Lakeside assumed a duty to warn the public about dangers on Storm Lake. Plaintiffs point to nothing in the lease that imposes a duty on Lakeside to inspect the lake itself or to warn the public of dangerous conditions. Plaintiffs argue that by agreeing to operate a Marina for use by the public, *see* the Lease at ¶ 3, Lakeside assumed a duty to warn the public about dangerous conditions on the lake. This provision does not advance plaintiffs' argument, because nothing in it requires Lakeside to inspect the lake or to take responsibility for warning the public of dangerous conditions on the lake. Accordingly, I find that Lakeside owed plaintiffs no duty to

---

an innkeeper "has no duty to warn its guests of naturally occurring surf conditions off of a public beach."). *But see Tarshis v. Lahaina Investment Corporation*, 480 F.2d 1019, 1020 (9th Cir. 1973) (holding that Hawaiian ocean-front hotel operator had a duty to warn its guests of dangerous conditions in the ocean which were known or should have been known to the operator but of which the guests were unaware, if the dangerous conditions were not obvious).

16

warn them of the dangers of the dredging operation on Storm Lake. Therefore, I grant Lakeside's motion for summary judgment.[6]

### III. CONCLUSION

For the reasons discussed above, Lakeside's motion for summary judgment is granted and this case is dismissed.

**IT IS SO ORDERED**.

**DATED** this 24th day of October, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

[6] Having decided the case on the duty issue, I need not address Lakeside's alternative argument that it has immunity under Iowa's recreational use statute.